Knut S. Johnson (CSB 125725)
LAW OFFICE OF KNUT S. JOHNSON
550 West C Street, Suite 790
San Diego, California 92101
(619) 232-7080
knut@knutjohnson.com

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.:  19-cr-1685-CAB |
| Plaintiff, | Mr. Liddy's motion to compel discovery |
| v. | |
| RAYMOND LIDDY, | |
| Defendant. | |

## Introduction

Mr. Liddy intends to file a motion for a new trial based on the government's failure to disclose – until after trial began and long after prejudicing the defense – that its expert (erroneously) concluded the computer files at the heart of this prosecution were accessible, when in fact they were not.  The defense made key strategic decisions based on what it understood was the undisputed state of the evidence.  By the time the government revealed its disagreement, it was too late; Mr. Liddy's defense

1

was irreparably compromised.

On this issue, during trial, the Court understandably believed the parties had simply, and innocently, failed to communicate their "fundamental assumptions in the case." Docket Entry (DE) 63 at 6. But this was not a matter of "ships passing in the night." To the contrary, it was one ship (the defense) making its position clear, while the other (the government) kept its position hidden. For nearly two years before trial, the defense repeatedly told the government that the relevant digital files were deleted and inaccessible in unallocated space (save for one that had a corrupt file extension). For nearly two years, the government never disputed this statement.

At best, the government was misinformed by its ill-trained forensic examiner and then failed to provide that information in its required Rule 16 and expert disclosures. At worst, the government intentionally ambushed the defense to gain a tactical advantage, in violation of Mr. Liddy's Fifth and Sixth Amendment rights to Due Process and a fair trial.

Reluctant to make unsubstantiated claims, however, the defense seeks information to clarify the basis for Mr. Gerou's erroneous opinion that the files in exhibits 17-21 were in allocated space, and the government's failure to disclose that opinion before trial. Accordingly, we ask the Court to grant

2

the specific discovery requests set forth below.  [Of note, the defense would have filed this motion earlier, but until last week the parties were still discussing a possible alternative disposition of the case.]

### Relevant Facts

For purposes of this motion, the relevant digital files were introduced as government trial exhibits 17-21 (stipulated files 6 through 10).  DE 59 at 1; 37 at 3.  These files were found in unallocated space on the San Disk Cruzer thumb drive, and were the basis of the conviction.  DE 63 at 78.  The government first provided notice of these files in a meeting regarding the Bill of Particulars, on May 10, 2019.[1]

Long before this, however, the defense engaged the government in numerous conversations about the state of the evidence, including that, except for one file with a corrupt extension, all the contraband files were deleted and inaccessible in unallocated space.

First, in mid-2018, Mr. Johnson was in negotiations with AUSA Green regarding potential case resolution.  At that time, the offer required pleading guilty to possessing files contained on the San Disk Cruzer.  On May 22,

---

[1] The use of the term "file" is telling.  Because the files were previously deleted and then recovered with forensic software, it was no longer appropriate to call them images.

2018, in an email, Mr. Johnson advised the government that the defense experts concluded those files were not accessible to Mr. Liddy: "I have discussed the San Disk Cruzer [root]/ New folder and neither [expert] believes that those images [including Exhibits 17-21] are accessible." The government never responded that Mr. Johnson's view of the evidence was in error.

A few months later, in a letter to the government on February 20, 2019, defense counsel again reiterated that "[m]ost important, virtually all the images were quickly deleted, and ultimately found only in unallocated space, inaccessible without sophisticated forensic software." [Of note, the defense used "virtually" only to account for the fact that one file – stipulated file 1 (jtfpanama.pdf) – was found in allocated space with a corrupt file extension that made it inaccessible.] Again, the government did not dispute this position.

Similarly, on March 11, 2019, in a motion to dismiss the information, the defense again reiterated, "virtually all of the images the government allededly found had been deleted, and were located only in unallocated space, inaccessible without sophisticated forensic software." DE 95 at 2-3 (17-cr-2475). The government filed a written opposition to this motion. *See*

4

DE 103 (17-cr-2475).   But once more, it failed to dispute the defense's statement that the files were in unallocated space.

Thereafter, on January 16, 2020, the defense made its position unmistakably clear:

"This is not a case with subjective expert opinions – e.g., whether the defendant suffered from mental illness or not. Rather, as relevant, the computer forensics in this case will involve *objective* factual questions, such as whether a file was deleted or accessible. As such, the defense believes it will be able to obtain all the expert testimony it needs by way of cross-examining the government's forensic analyst, Mr. Gerou.

"The defense, therefore, does not intend to call Mr. Roloff as part of its case, unless the government's expert testifies in a way counter to our understanding of the objective forensic evidence (which we don't know because we don't have a summary of his testimony) . . . . If called as a witness, **Mr. Roloff will testify to the objective fact that nine of the files in the bill of particulars were located in deleted/inaccessible space** . . . and the remaining file had a corrupt file extension and thus could not be opened/accessed by normal methods (e.g., double-clicking)."   DE 45 at 9-10 (emphasis added).

Yet again, the government never responded that this version was

wrong.

Finally, during the pre-trial hearing on this exact issue, after the government complained about a purported lack of notice, defense counsel responded: "**They haven't told us what opinions their expert is going to give**, and we don't have those to give because we think we're going to be able to get everything from their expert." DE 52 at 13-14 (emphasis added). At that point, although the government must have known its own expert disagreed on this essential point, it did not disclose this critical fact to the Court or the defense, as was plainly required by Federal Rule of Criminal Procedure 16(G) ("the government must give to the defendant a written summary of any testimony that the government intends to use").

Not until the government called its last witness at trial, Mr. Gerou, did the defense first learn that the government's view of the evidence was both inaccurate and contrary to the position repeatedly voiced by the defense.[2] That the government withheld this information is significant.

---

[2] The government may respond by pointing to its trial memo, which noted that "one thumb drive contained at least three child pornography image files that were deleted; and the other thumb drive contained at least five child pornography image files." DE 51 at 4. The government may claim the absence of the word "deleted" in the second clause should have put the defense on notice. If this is its argument, however, it proves the opposite – i.e. that the government was trying to hide the ball. Otherwise, it would have plainly stated the files were active or in allocated space. Of course, it did not.

Had the government provided notice to the defense that it believed the files were active, or if the government would have candidly responded to the defense's repeated notice that the files were deleted, the trial defense of Mr. Liddy would have looked much different.

These differences in the defense strategy will be further detailed in the anticipated new trial motion.  However, as just one example, had the government disclosed Mr. Gerou's opinion – as required – the defense likely would have opted for a trial strategy (potentially with a jury) focusing on Mr. Gerou's reliability.  The likely cross-examination questions are obvious, for instance:

Q:   Are you as sure about your testimony that exhibits 17-21 are in allocated space as you are about the rest of your testimony?

Q:   You would agree that if you are wrong about that, it would be a very significant error?  (Etc.)

The defense would then have used a virtual machine[3] so that, on cross-examination, Mr. Gerou would have been forced to concede, in open court, he was wrong about this critical objective fact.  With his credibility in ruin, and

---

[3] As Mr. Gerou conceded, a virtual machine would have allowed him to show the trier of fact exactly how the files appeared on the computer media and would have confirmed they were inactive files in unallocated space.  DE 72 at 136-137.

no need to call its own expert, the defense would have argued reasonable doubt based on the flawed forensic evidence.

In short, the government's decision to withhold its expert opinion that the exhibits 17-21 were in allocated space seriously impacted the defense's strategy and the fairness of the trial. The question is why did the prosecutors make the decision not to inform defense counsel that they believed the images in exhibits 17-21 were in active data? And the answer is plainly relevant to Mr. Liddy's anticipated motion for a new trial. Also relevant is whether, in light of the defense's repeated assertions about the state of the evidence, the government took any steps to confirm the accuracy of Mr. Gerou's opinion (or his accuracy generally) before putting him on the stand.

### Relevant legal principles

Under Federal Rule of Criminal Procedure 33: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." In other words, a new trial is the remedy for proceedings tainted by unfairness. *See United States v. Smith*, 893 F.2d 1573, 1583 (9th Cir. 1990) (a new trial is appropriate where the government's conduct "materially affected the fairness of the trial.").

The information requested below will allow the defense and the Court

to evaluate the extent to which the government acted unfairly. These requests are also made in light of Mr. Gerou's testimony and reports, which the government acknowledges were inaccurate. As noted, these materials are necessary for the defense to review prior to filing a motion for a new trial.

The defense is entitled to this information under Rule 16(c), as well as the Due Process Clause, and *Brady*/*Giglio*. After all, "[t]he prosecutor's job isn't just to win, but to win fairly, staying well within the rules." *United States v. Maloney*, 755 F.3d 1044, 1046 (9th Cir. 2014) (en banc) (internal quotations and citation omitted).

Indeed, if nothing else, the fact that the subject files were inactive and in unallocated space was exculpatory and thus triggered *Brady*. And "under *Brady* [even] an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment." *Strickler v. Greene*, 527 U.S. 263, 288 (1999). Moreover, if Mr. Gerou had a pattern of mistakes, that is also evidence favorable to the defense under *Brady*/*Giglio*. *See Schad v. Ryan*, 671 F.3d 708, 715 (9th Cir.2011) (discussing "[t]he prosecution's duty to disclose material, potentially exculpatory evidence — including impeachment evidence — to a criminal defendant").

### Specific Discovery Requests

The information sought in the following requests is relevant to determining what the government should have disclosed to the defense prior to trial. It is also relevant to whether the government should have known of Mr. Gerou's mistakes or had reason to doubt his conclusions, and whether it had a duty to further investigate before putting him on the stand. *Cf. United States v. Cedano-Arellano*, 332 F.3d 568, 570-71 (9th Cir. 2003) ("materials at issue were crucial to [assessing] the dog's reliability, a very important issue in [the] defense, and to conduct an effective cross-examination of the dog's handler" at a "pretrial evidentiary hearing[.]").

### 1.   Documentation of Mr. Gerou's Opinions and Interpretations

When a member of the RCFL provides an opinion or interpretation, it is required to be in writing. Here, Mr. Gerou's opinion and/or interpretation (albeit inaccurate) that the Government's trial exhibits 17-21 were in active space, **is not contained within his Report of Examination**. Under the RCFL's rules, that opinion and/or interpretation must be in writing.

The defense requests the written statement from Mr. Gerou stating his opinion and/or interpretation that the files were in active space.

### 2.   All Written Communications Regarding the Subject Files

The defense requests all written materials (including emails, text

messages, etc.) between members of the prosecution team, including the agents and Mr. Gerou, regarding the issue of whether the subject files were active files in allocated space or inactive files in unallocated space. We have no objection to the Court reviewing these emails *in camera*.

### 3.   Mr. Gerou's Competency and Proficiency Assessments

By way of background, competency tests are administered to determine if the examiner "has acquired and demonstrated specialized knowledge, skills, and abilities in the standard practices necessary to conduct examinations in a discipline and/or category of testing prior to performing independent casework" and proficiency tests are "intended as an evaluation of participant performance against pre-established criteria." *See* National Commission on Forensic Science, *Proficiency Testing in Forensic Science*. Available at https://bit.ly/2WBdnLF. Per the RCFL's rules, Mr. Gerou should receive proficiency tests on a yearly basis.

The defense requests the results of Mr. Gerou's competency testing and the results for his last five proficiency tests.

### 4.   Results of Technical or Peer Review

A minimum of 20 percent of Mr. Gerou's cases are subject to a technical review (sometimes called peer review). The purpose of this review is to ensure that the examiner opinions are scientifically valid. Moreover, all

11

examination results requiring an opinion requires a technical review.

The defense requests the following information about the technical review conducted in this case: (1) the name of the reviewer(s) and (2) all documentation regarding this process, including an FBI Form 18-17.

### 5.   Results of Administrative Review

Prior to the release of Mr. Gerou's Report of Examination, it was subject to an administrative review.  The defense requests the name of the person who conducted the administrative review and the results.

### 6.   Monitored Testimony Results

At least once per year, an examiner is required to have her or his testimony monitored.  The results of the examiner's performance are captured in an FBI 18-14 (External Evaluation of Court Testimony), an FBI Form 18-15 (Internal Evaluation of Court Testimony), or some other comparable document.  The defense requests all such forms for Mr. Gerou for the last five years.

### 7.   Corrective Action Reports and/or Quality Action Requests

When a Computer Analysis Response Team ("CART") member makes a mistake, such as wrongly indicating that a deleted item was still accessible on a device, which is sometimes deemed a nonconformity, the RCFL is required to immediately take and document corrective action.  Generally, the

RCFL uses Form 18-16 (Quality Action Request).   The defense requests documentation related to Mr. Gerou's errors in this case, as well as documentation from other incidents over the past five years.

### 8.   Root Cause Determination Reports and Corrective Actions

In circumstances such as this one, where a corrective action is taken, the RCFL is required to investigate the root cause of the error.   The RCFL is also required to determine what steps should be taken to correct the mistake.   The defense requests documentation regarding RCFL's analysis of the root cause of Mr. Gerou's error as well the corrective actions that are being implemented to ensure that he will not make these same mistakes in the future.

### 9.   Audits of Mr. Gerou's Prior Cases

In light of the significance of Mr. Gerou's error, it likely triggered an audit of his prior case work.   The defense requests the government confirm an audit occurred, and assuming it did, provide all information about additional nonconformities in Mr. Gerou's case work.

### 10.   The Updated Quality Assurance Manual

The government has provided the following document: *Federal Bureau of Investigation (FBI) Digital Evidence Laboratory (DEL) Quality Assurance Manual (QAM)* that was revised on March 15, 2017.   According to this

document, it was superseded on August 15, 2017.   Because Mr. Gerou's report was drafted after August 15, 2017, and his testimony occurred in 2020, the defense requests all QAMs from the August 15, 2017 revision to February 2020.  Generally, the FBI refers to these as archived manuals.

11.   <u>Computer Analysis Response Team ("CART") Standard Operating Procedures ("SOPs")</u>

In addition to the QAM, FBI CART members, including Mr. Gerou, must comply with the CART's SOPs.  The SOPs contain the examination and technical procedures, and address the handling, transport, storage, and preparation of evidence to be examined.  In short, SOPs spell out what an analyst should do and how she or he should do it.  Mr. Gerou's actions must be in dereliction of these procedures.  The defense requests these SOPs.

## Conclusion

Mr. Liddy respectfully requests the Court grant this motion and order the requested discovery.

Dated: May 27, 2020                          Respectfully submitted,

                                             */s/ Knut Johnson*

                                             Knut S. Johnson
                                             John C. Ellis
                                             Devin Burstein
                                             Attorneys for Mr. Liddy

14