Knut S. Johnson (CSB 125725)
LAW OFFICE OF KNUT S. JOHNSON
550 West C Street, Suite 790
San Diego, California 92101
(619) 232-7080
knut@knutjohnson.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.:  19-cr-1685-CAB |
| Plaintiff, | Defendant's Sentencing Memorandum |
| v. | September 2, 2020, 1:30 p.m. |
| RAYMOND LIDDY, | |
| Defendant. | |

I.    Introduction

The evidence proves that Ray Liddy did exactly what he told the agents: he deleted pornographic images when he saw they included children.  Setting aside the question of whether he should have deleted them more quickly, there can be no doubt that Mr. Liddy never searched for child pornography, never asked for child pornography, and never collected child pornography.  He has suffered greatly from post-traumatic stress disorder due to, in large part, his service to this country.  The just sentence for this unusual case is probation.

/ / /

1

II.    His life

This memorandum will discuss Ray Liddy's life in two intersecting pieces.  First, the general trajectory of his life.  Second, how his life experiences led to the charges in this case.

It is impossible to tell Mr. Liddy's story without beginning with his father, G. Gordon Liddy.  The elder Mr. Liddy was, of course, at the center of the Watergate scandal.  When the story broke, it quickly became the biggest in the world.  It was a true national obsession, and it continued for years.  G. Gordon Liddy became a villain to millions and millions of people.

The impact on his son is easy to imagine but difficult to comprehend.  Ray Liddy was still young.  It seemed like the entire world hated his father.  And far too many people were ready and willing to cast the sins of the father onto his innocent son.  Time and again, the young Mr. Liddy was ridiculed for his father's misdeeds.  The trauma of it all was overwhelming.

 Indeed, as a result of his father's actions, throughout Mr. Liddy's childhood he suffered extreme stresses, shame, poverty, and a desire to reach above that poverty.  For instance, this picture from People's Magazine article about the family in December 20, 1976, shows Ray at 12 years-old (far left) and explains his mother's concern about the potential loss of the family home and the need for food stamps because of her husband's imprisonment.

2



Her concern was well founded. In addition to relying on food stamps, the electricity was often turned off for failure to pay, so often that his mother was on a first name basis with the cashier at the electric company. Ray was on the school lunch program. Mr. Liddy was harassed and shamed at school by teachers and students because of his father's case. Those experiences left him with a drive to protect others.

Answering the call to protect others, Mr. Liddy enlisted in the Marine Corps in 1986. He completed Officer Candidate School, The Basic School, Infantry Officer School, Army Ranger School (one of six Marines in his class in 1988), Basic Airborne Course, Fast Rope Master Course, and U.S. Army Jungle Warfare Course. He completed a unit deployment to Asia. In September 1989, he deployed to combat in Panama, as a Rifle Platoon Commander in the expeditionary force of Operation Just Cause.

Mr. Liddy's impact on his men was profound: twenty five years later he received an unsolicited message from his radioman in Panama, thanking Mr. Liddy for teaching

him "about life, respect, pride, responsibility, teamwork, commitment, education, and much more." Appendix, page 1. Here are pictures of his forward operating base in Panama:





Mr. Liddy's Rifle Platoon protected Department of Defense property, including the Arraijan Tank Farm, which stored advanced weapons.  The U.S. Army had previously used explosive devices to protect the perimeter of the property.  Among other missions, Mr. Liddy's platoon was ordered to retrieve the explosives, although one had a faulty mechanism.

Because no Explosive Ordinance Detail (experts in handling explosives) was available, one of Mr. Liddy's men, Corporal Burtle, volunteered to destroy the faulty explosive device using standard procedure.  Mr. Liddy, however, deemed the situation too dangerous, and took over the removal.  Tragically, the device unexpectedly exploded, and Mr. Liddy was nearly killed, suffering burns over 14% of his body.

The trauma from his burns caused an inability to breath and required resuscitation.  After emergency evacuation to a hospital, doctors put him in a medically induced coma to save his life.  For two days the physicians in Panama tried to stabilize Mr. Liddy, and once he was well enough, Mr. Liddy underwent emergency air evacuation from Howard Air Force Base in Panama to Brooks Army Medical Center at Fort Sam Houston, Texas.

He stayed in the Brooks' burn unit for months undergoing treatment, described in medical literature as "equivalent to or worse than the pain of an initial burn injury."[1] Burn treatment alone may lead to "long-term anxiety and post-traumatic stress disorder

---

[1] Griggs, Goverman, Bittner, and Levi, SEDATION AND PAIN MANAGEMENT IN BURN PATIENTS, Clin Plast Surg. 2017 July; 44(3): 535–540. doi:10.1016/j.cps.2017.02.026 (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5642992/pdf/nihms869571.pdf).

["PTSD"].[2]  In Mr. Liddy's case, he underwent (among other painful treatments) mechanical debridement, a process that involves scraping his skin off in an unimaginably painful and awful procedure.  Mr. Liddy recalls weeks of being wheeled into treatment, staring into a blank space on a wall, and then suffering the worst pain of his life, despite attempts at anesthesia.  The Veterans Administration ("VA") puts Mr. Liddy's overall disability from his burns at 50%.  Ex. A.

Two and a half weeks before Mr. Liddy's injuries, 22 Marines were killed in a helicopter crash in Korea, and those few who survived were severely burned.[3]  Once in the Intensive Care Unit at Brooks, Mr. Liddy could not see because of bandages on his face but he heard medical personnel complain about the boisterous behavior of those badly burned crash survivors.  Mr. Liddy asked to be transferred into the same ward as the boisterous Marines, who were also undergoing the frequent scrubbing of dead, burned skin from their living flesh.  When Mr. Liddy did not scream during his debridement, the Marines asked in awe, "who is that man?"  "That man," they were told, "is a Marine officer."  They adopted Mr. Liddy as their lieutenant.  One, whom Mr. Liddy visited even though the Marine was in a coma, succumbed to his burns and died in the hospital.

---

[2] *Id.*, citing two sources.

[3] *See*, NY Times, March 20, 1989, Section A, page 2, available here: https://www.nytimes.com/1989/03/20/world/22-marines-are-killed-in-crash-of-us-helicopter-in-south-korea.html.

In the Marine Corps, selection as a "regular" officer (as opposed to a reserve officer) is a prestigious and career-changing event. That was Mr. Liddy's long-held dream. Months before Mr. Liddy's devastating wounds, in February 1989, the Commander of Marine Forces Panama gave his "highest possible recommendation for augmentation to the Regular Marine Corps" to the Commandant of the Marine Corps. Ex. B. After leaving the hospital, Mr. Liddy understood that he was unable to perform the duties he needed to perform to lead troops in the field. Thus, he formally declined the hard-fought opportunity of a career in the Marines and went to law school. Ex. C.

During his first year in law school, as a reserve officer Mr. Liddy was activated for Operation Desert Storm. He was first assigned to a battalion replacement company (created under the assumption of mass casualties during the war), then a security platoon, collecting weaponry, and later to Quantico for a battle assessment team, where he worked under, then Major John Kelly, who became a friend. (General John Kelly later was Chief of Staff under the current administration). After being released from active duty, Mr. Liddy competed his last two years of law school in one year (including summer classes), graduated, and went to work at Adams, Duque & Hazeltine. He later moved to Luce, Forward, Hamilton & Scripps when the firms combined.

Mr. Liddy was then again activated and deployed to the war in Iraq as part of Operation Iraqi Freedom. During that tour, Mr. Liddy served with Staff Sgt. Crowley, among the first Marines killed in the war. Mr. Liddy oversaw retrieving the body and wrote the condolence letter to Sgt. Crowley's widow.

Mr. Liddy served in active combat zones. He was frequently shot at by small arms, sniper, and mortar fire. His battalion suffered numerous casualties. He continues to have residual guilt and nightmares over casualties, including an Iraqi civilian who was shot in the head by U.S. forces in a terrible accident. Mr. Liddy saw the accident and held and comforted the dying civilian to the end. Mr. Liddy prayed over him and helped the dying man transition from life to death. That experience haunts Mr. Liddy to this day, waking him and leaving him with grief, anger, guilt, and trauma. For his service in Iraq, Mr. Liddy was awarded the Combat Action Ribbon, an award General Mattis reserved for those in active combat. Ex. D.

Mr. Liddy's reserve service continued after Iraq, including several important assignments and numerous citations, decorations, and awards and culminating in his promotion to Colonel. Ex. D.

As he approached mandatory retirement from the Marine Corps on September 1, 2016, Mr. Liddy found himself lost –no longer a Marine, no longer a protector of others. It is impossible to overstate the impact on Mr. Liddy. The loss of his Marine identity shook him to the core.

As he began transitioning out of the Marine Corp, Mr. Liddy's service-related PTSD, first diagnosed in 2005, caused his loss of identity to become a mental health crisis, and contributed to the circumstances that led to the events in this case. The Veterans Administration treats Mr. Liddy for his PTSD as Priority 1. Ex. A; Pre-Sentence Report ("PSR"), ¶ 69.

He was prescribed Ambien for his inability to sleep (due to his PTSD and anxiety). He then began drinking wine at night after taking Ambien. Intoxicated, depressed, and still unable to sleep, he began reckless use of the Internet. It was there that he encountered child pornography in adult chat rooms. This was material that he never looked for and always deleted. Indeed, one of the unique factors of this case is that there were *no* internet searches for child pornography.

Thus, while we all agree possession of child pornography is a serious crime, Mr. Liddy's case is the most mitigated the undersigned has ever encountered. At bottom, the essential facts of his conduct are that he never sought child pornography, never collected it, and had none accessible on his computer.

### III.   His character

Moving beyond the circumstances of the offense, it is important for the Court to get a sense of Mr. Liddy aside from this case. To that end, we believe the following good conduct is relevant to the sentencing calculus.

#### a.  His giving

Mr. Liddy has been and remains active in many charities and community-based organizations. PSR, ¶ 88. Those include:

- Humble Design, which designs and furnishes homes for families and veterans transitioning from homelessness (financial contribution and volunteer labor);
- The Gary Sinise Foundation, which provides custom homes for severely injured veterans, and activities to entertain and inspire veterans, first responders, and their families (financial contributions and helped organize local events);

- Ride on Center for Kids (ROCK), which provides equine-assisted therapies for children, adults, and veterans with disabilities in Texas (Sponsor 2 horses);
- Pro Bono attorney for the San Diego Chapter of the U.S. Navy League for 4 years;
- Voices for Children – supports advocates for children in foster care transitioning out of the system (made financial contribution for several years);
- Mama's Kitchen, the "meals on wheels" for HIV/Aids patients who are home bound.

The total giving between 2017 and 2019 is about $142,000 along with many hours of volunteer work, despite the pressure and cost of this case.

> b. His service to the State of California and the Bar

Mr. Liddy had a distinguished career as an attorney, with three San Diego County Top Attorney Awards for his skill before and while serving as a Deputy Attorney General with the California Attorney General. Ex. E. As a Deputy A.G., he represented the State of California honorably and well in multi-district civil fraud litigation throughout the United States.

As a Deputy Attorney General, Mr. Liddy worked on civil False Claims Act cases and he brought about $90 million back to the State of California in 9 years. The State offered Mr. Liddy free covered parking because of his status with the Attorney General. However, his secretary - who was about his age and a mother of two – had to pay for her own parking. Reflective of his generous and helping spirit along with his deeply felt need to protect others, Mr. Liddy gave his secretary the free parking so she would not have to park on the street and walk to her car in the dark; he paid for his own parking.

Also, as recounted by Randal Glaser (Appendix, pages 34-35), Mr. Liddy handled a civil Medi-Cal fraud case in which we could have put a business into bankruptcy; but that would have deprived a community of a needed source of Medi-Cal supplied equipment. Instead, Mr. Liddy reached a settled appropriate to prevent further abuse, and that settlement would allow the company to "continue serving its financially impacted clients." Mr. Liddy exhibited the type of justice we expect from government attorneys.

### c.  His support of others

In addition to his support of people he does not know, through charity, Mr. Liddy has been a tremendous support for those in his life, in addition to the example of his help of his secretary discussed above.  See the summary of letters below.  The letters make clear that Mr. Liddy is one of those exceptional and rare people who gives to all around him.

### d.  His service to and sacrifice for country

Mr. Liddy's service, discussed above, resulted in psychic and physical injuries. This is how the Department of Defense summarizes his career:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**MILITARY CAREER EXPERIENCE SUMMARY**

| (approx period) | (billet, unit, Active/Reserve) |
|---|---|
| 2/14- 9/16 | **Asst. Chief of Staff (Reserve)**, G-1 Manpower, First Marine Division: Review non-criminal administrative separation orders, Freedom of Information Act request, other administrative issue relating to manpower. |
| 3/11-1/14 | **G 3/5 O&T IMA Det,** CPEN (RESERVE)<br>Asst. OIC: LNO to San Diego Country EOC: Coordinate MCI West EOC Operations ISO FEMA disaster relief or all hazard response. LNO to outside agencies. |
| 12/08-2/11 | **MTU ISO G 3/5 O&T IMA Det,** CPEN, (RESERVE): LNO/Senior Watch Office for EOC<br>(Promoted to 06/Colonel) |
| 10/05-2/08 | **MAGTFTC IMA DET,** MCAGCC, 29 Palms CA (ACTIVE) Positions include:<br>Deputy Director of Operations, MAGTF TC G-3<br>Future Ops O, MAGTF TC G-3 Air Space, Land Expansion Project/ Large Scale Exercise development for MEB sized unit training at MCAGCC 29 Palms<br>MAGTF TC G-3 LNO/ ACOR for ETT "Mountain Viper" Mission Rehearsal Exercise (Afghan Theater), Hawthorn NV. |
| 6-8/07 | **MECEP Program/Staff:** (ACTIVE) English Composition Instructor, MECEP Prep. Course, MCRD San Diego, CA |
| 8/03-5/07- | **MAGTFTC IMA DET,** MCAGCC, 29 Palms CA (ACTIVE) Positions include:<br>JIEDDO LNO, MAGTF TC G-3;<br>Coordinated integration of C-IED technology for "Mohave Viper" Mission Rehearsal Training; Assisted in the establishment of JIEDDO Counter IED Joint Center of Excellence at 29 Palms ($54 million project) |
| 9/02-7/03 | **I MACE CPEN** (RESERVE)<br>Assistant Ops O<br>Included temporary assignment as LNO, MAGTFTC G-3, 29 Palms to MAWTS-1 for (May) MPC and (June) Desert Talon Exercise; Accepted into AWC DDE TLS program.<br>Deputy G-1, I MACE (RES); Pay, mobilization/demobilization, and retirement issues |
| 9/98-8/02 | **2nd Battalion 23rd Marines**<br>Adjutant and S-1 Officer, 2/23, (ACTIVE);<br>Responsibilities included fulfilling Perso/S-1, including Unit Diary certification, and Adjutant tasks, including representing the BN in pre-confinement hearings and ADMIN SEP boards. Period included deployment for OIF attached to RCT-1; and 1 month acting BN Executive Officer, forward. |
| 9/99-3/02 | Company Commander, G Co. 2/23 (RESERVE & ACTIVE)(included mobilization for GWOT Operation Noble Eagle for Ready Reaction Force ISO FEMA IX) and included CAX Exercise in 2000. |
| 5/98-8/99 | **MTU CA-49** Instructor, (RESERVE) ISO CAST Reserve Unit Training, MCB Pendleton; |
| 2/91-8/91 | **IRR (Desert Storm)(ACTIVE)** (Mobilized while attending law school)<br>Asst. Analyst, Anti-Tank, Battle Assessment Team, Operation Desert Storm, (Quantico)<br>Platoon Commander, Combat Replacement Company, Operation Desert Storm (MCB LeJuene) , and Security Platoon Commander for Armory and Retrograde in-processing operations. |
| 3/89-10/89<br>9/1987-2/89 | **1st BN 6th MAR (ACTVE)**<br>S-3 Training Officer: Coordinate training schedules and ranges for battalion.<br>Rifle Platoon Commander; C Co. 1st BN 6th MAR (ACTIVE); Period included UDP and deployment as expeditionary force to Panama,1989 (Operation Just Cause) |

This is how the Department of Defense describes his military education and decorations:

| CIVILIAN EDUCATION (school/date completed): | MILITARY EDUCATION (school/date completed): |
|---|---|
| FORDHAM LAW SCHOOL, J.D., 1993<br>FORDHAM UNIVERSITY, B.A., 1986<br>THE MERCERSBURG ACADEMY, Diploma, 1982 | US JOINT FORCES CMD DEFENSE SUPPORT OF<br>CIVILIAN AUTHORITY (DSCA) COURSE 2011;<br>SENIOR LEADERS COURSE 2010; |
| **DECORATIONS** (award/date received): | MASTER OF STRATEGIC STUDIES, U.S. ARMY |
| MUC, 2008 | WAR COLLEGE (Carlisle, PA), 2007; |
| MSN, 2004; | EWTG PAC MAGTF FIRES COURSE, 2005; |
| CAR, 2003; | EWTG PAC INFORMATION OPERATIONS, 2004 |
| PUC, 2003; | COMMAND AND STAFF DEP, 2003; |
| ICM 3rd Award, 2003; | MAGTF/MCPP, 2002; |
| GWOT SM, 2003; | II MEF NON-LEATHAL COURSE., 2002; |
| AFRM, W/ "M" & BRZ HOUR GLASS DEVICES,<br>1991, 2002, 2007; | AWS NONRES PHASE I, 2001;<br>EWTGPAC LAW OF WAR INST COURSE,1994; |
| SSD 3D AWARD, 1988,1989, 2003; | U.S. ARMY JUNGLE WARFARE SCHOOL,1989; |
| NAT'L. DEF. SER. MEDAL, 2D, 1991, 2002; | FAST ROPE MASTER COURSE (Army), 1989; |
| SMCR MEDAL, 2D, 2000, 2003; | BASIC AIRBORNE COURSE,1988; |
| NUC, 1989; | ARMY RANGER SCHOOL,1988; |
| MARINE EXP.  MEDAL, 1989; | INFANTRY OFFICER COURSE, 1987; |
| PARACHUTIST BADGE, 1988; | BASIC SCHOOL, 1987. |
| U.S. ARMY RANGER TAB, 1988. | |

e.  What those who know him say

Many people wrote this Court about Mr. Liddy.  Those letters are attached to the Appendix to this memo.  Many letters note his philanthropy, generosity, remorse, service, and other positive characteristics.  However, some letters bear noting specifically.

First, in 2013, Ruben Saavedra[4] sent Mr. Liddy an unsolicited note on LinkedIn:

> Good Morning Sir, you may not remember me but I served as your radio man in the 6th Marines during Panama. We participated in many patrols and training exercises but the thing that changed my life was during the down time. it was during

---

[4] Counsel for Mr. Liddy recently spoke to Mr. Saavedra, who confirmed that he had written the LinkedIn note and that he stood by what he had written in 2013.  Mr. Saavedra is now a prominent member of the Chicago business community and he gave counsel permission to provide his 2013 message to this Court.  Recent news reports show that in addition to his business activities, Mr. Saavedra recently organized food donations during the coronavirus pandemic.  *See*, https://blockclubchicago.org/2020/04/23/families-can-get-free-food-at-east-side-soccer-dome-saturday/ (last seen 8/23/2020).

those down times, that you taught me about life, respect, pride, responsibility, teamwork, commitment, education and much more. I put myself through night school, have a successful career and a great family. It has been almost 25 years since I last served under you but the great things that you taught me then, I now emulate in my personal and professional life. Thank you for inspiring me to be the best and it was my honor to serve under your command!  [Appendix, page 1]

Scott Sonne was Managing Partner of Luce Forward when Mr. Liddy went to work there.  He also became a social friend and neighbor 18 years later.  He thinks Mr. Liddy is an honorable and fine person and that Mr. Liddy is distraught about what happened.  Appendix, page 2.  Michael Parker has known Mr. Liddy since Ray was about eight years old.  He believes him to be "modest, truthful, and guileless."  His wife has named Ray as her personal representative in her health directive, and their love for Mr. Liddy jumps from the pages of his letter.  Appendix, pages 3-4.

Joan Macfarlane notes Mr. Liddy's extraordinary remorse and humiliation.  Appendix, pages 8-9.  Mr. Liddy reached out to Kathleen Menghi, his wife's aunt, to apologize for any pain his arrest may have caused her or her family.  Appendix, page 10.

James (Gear) Liddy, Mr. Liddy's nephew, recalls how strongly Mr. Liddy supported him while Gear was managing a difficult family situation.  He also notes how Mr. Liddy has been changed by this case.  Appendix, page 17.  Jerry Willingham served with Mr. Liddy but retired from the Marine Corps in protest because he saw "sexual harassment, sexism, and extramarital affairs."  However, "Ray never exhibited any inappropriate behavior toward female Marines, and never tolerated it from those around

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

him." Appendix, page 27.

Many letter writers discuss Mr. Liddy's generosity of spirit. For instance, both Mr. Parker (Appendix, page 4) and Mr. McDonald (Appendix page 5) note Mr. Liddy's generosity in helping others. Mary George notes the same generosity ("always goes out of his way to help his friends or anyone in need.") Appendix, page 6. Lt. Col. Ian Stone, U.S.M.C. (Ret), who served with Mr. Liddy in Iraq, notes the same quality ("Ray has always been an exceptionally considerate and thoughtful person, one that I've always observed works towards helping others and adding value to other relationships."). Appendix, page 14. Col. Robert McMonagle, USMC (Retired) also tells the Court how Mr. Liddy helped him recently. Appendix, page 37.

Several other letter writers noted Mr. Liddy's remorse, regret, and the resulting change to his demeanor. For example, Herm Rosenman, a prominent San Diego based businessman, notes Mr. Liddy's deep remorse and stress. Appendix, page 24. Treger Strasberg, a prominent philanthropist focused on homelessness, also notes the struggle Mr. Liddy now has: "I can see it hang on him every time we see each other. He is quiet, sad and pensive. The positivity he exuded that drove others around him to do and be better has subsided. He always puts on a good show, but friends can see his struggle." Appendix, page 26. His nephew, Matt Ryan, sees that Mr. Liddy, who he loves unconditionally, now feels the need to isolate himself and notes his certainty that Mr. Liddy "deeply regrets his actions and more than learned his lesson." Appendix, page 29. Nick Paul, Mr. Liddy's supervisor at the California AG, notes the same changes to

Mr. Liddy. Appendix, pages 32-33. So does Randall Glaser, a former colleague at the Attorney General's Office. Appendix, pages 35-36. His college roommate, Michael Hanratty, and his high school roommate, Tonio Bahner, also see Mr. Liddy's remorse. Appendix, pages 39 and 41-42.

Counsel also asks this Court to consider the letter from Courtney Liddy, Ray's wife. Appendix, page 20. She writes how this case has diminished him, physically and emotionally. Mr. Liddy is devastated by how he has disappointed his family, his neighbors, and his reputation, and that he might have inadvertently harmed others. Although she saw his PTSD symptoms before the arrest, she is not a medical expert and did not understand the meaning of Mr. Liddy's changes: the "increase in drinking, more frequent bouts of insomnia . . . decreased interest in social activities." Appendix, page 21. She has since fully supported Mr. Liddy's PTSD treatment through the VA and stands by him. Appendix, page 22.

### f. What the forensic evidence proves about his behavior

As explained above, Mr. Liddy never sought out child pornography and never exhibited characteristics experts agree are associated with people interested in child pornography. This case is a "one-off" fact pattern that will never repeat itself to this Court. First, Mr. Liddy's search history confirms he never searched for contraband images. Second, all contraband images found on Mr. Liddy's computer were deleted or inaccessible. Third, the location of the contraband images on the computer were in a folder that is consistent with someone providing them to Mr. Liddy. Fourth, Mr. Liddy

did *not* have peer-to-peer software or access to the dark web, which are common in cases where a person is intentionally seeking contraband images.  In short, the forensics support what Mr. Liddy has admitted since the day of his arrest: if someone sent him an image involving a child, he promptly deleted it.

### g.  His medical condition

The defense has filed materials under seal related to Mr. Liddy's psychological and medical conditions.

### IV.    Departures and variances

Every aspect of Mr. Liddy's life, his experiences, and his trauma support departures and variances, separately and together.

First, the combination of his military service and PTSD warrant departure under U.S.S.G. § 5H1.11, as noted in the PSR.  PSR, ¶¶ 102-103.  The PSR focuses on military service only as a basis to depart (finding Mr. Liddy "is a highly decorated United States Marine Corps Officer with an impeccable service record spanning 30 years of commitment and dedication to his country").  However, that service, and the PTSD that *resulted from the service* warrants a larger departure than recommended by the PSR.  The National Institute of Health describes PTSD this way:

> PTSD is an anxiety disorder that some people get after seeing or living through a dangerous event. When in danger, it's natural to feel afraid. This fear triggers many split-second changes in the body to prepare to defend against the danger or to avoid it. This "fight or flight" response is a healthy reaction meant to protect a person from harm. But in PTSD, this reaction is changed or damaged. People who have PTSD may feel stressed or frightened

17

even when they're no longer in danger.[5]

There is general agreement that the greater exposure to traumatic events, the more severe the PTSD symptoms.[6] Deployment to Iraq (such as Mr. Liddy served) involved multiple stressors, even in the absence of individual traumatic events: "130 degree temperatures, unrelenting noise, lack of privacy, and the constant threat of being attacked by mortar rounds, rocket propelled grenades, or biological and chemical agents" as well as unsanitary living conditions.[7] Mr. Liddy encountered all these threats.

Courts agree that leniency towards veterans and those suffering from mental health issues from combat is appropriate. In *Porter v. McCullom*, 558 U.S. 30, 43-44 (2009), the Supreme Court held that an attorney who fails to raise military service as mitigation may violate a defendant's Sixth Amendment right to competent counsel: "Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did. [Footnote omitted.] Moreover, the relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on

---

[5] National Institute of Mental Health, What is Post-Traumatic Stress Disorder, or PTSD http://www.nimh.nih.gov/health/publications/post-traumatic-stress-disorder-ptsd/what-is-post-traumatic-stressdisorder-or-ptsd.shtml, viewed August 11, 2020.

[6] Norman Poythress, Christopher Slobogin, Tomika K. Stevens & Kirk Heilbrun, § 9:37. Posttraumatic Stress Disorder – Areas of Scientific Agreement, 2 Modern Scientific Evidence: The Law and Science of Expert Testimony (2005-2006).

[7] American Psychological Association Presidential Task Force on Military Deployment Services For Youth, Families and Service Members, The Psychological Needs Of U.S. Military Service Members and Their Families: A Preliminary Report, at 4, 9 (February 2007).

Porter."

Many other courts have held that military service and the trauma that resulted from that service warrants a lower sentence. *See, e.g. Kimbrough v. United States*, 552 U.S. 85, 110 (2007) (departure for serving in combat during Operation Desert Storm and receiving honorable discharge from the Marine Corps); *Rita v. United States*, 551 U.S. 338, 367 (2007) (Concurrence by Justice Stevens) ("That said, I do believe that there was a significant flaw in the sentencing procedure in this case. The petitioner is a veteran who received significant recognition for his service to his country. That aspect of his background is not taken into consideration in the Sentencing Guidelines and was not mentioned by the District Judge in his explanation of his choice of the sentence that defendant received. I regard this as a serious omission[.]"); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (Departure to probation warranted for multi-million dollar fraud scheme where, among other things, defendant served six-years in the Marine Corps); *United States v. Howe*, 543 F.3d 128, 139 (3rd Cir. 2008) (Departure to probation in wire fraud case with 18-24 month range reasonable considering, among other things, defendant's 20 years of military service).

In general, the government agrees that service in the military can support downward variances. For instance, the government recommended a four-level departure or variance for a congressman who stole campaign money for at least a six-year period but who served in the military and was deployed in wartime. *See*, 18-cr-3677-W, docket entry 113, page 7 footnote 1. Mr. Liddy, unlike the congressman, suffered combat

injuries that resulted in a 50% disability rating but still rose to the rank of Colonel. Surely, a greater departure is warranted for this extraordinary service.

Second, charity and giving are also common grounds to depart and or vary. The PSR discusses Mr. Liddy's charity. More than just a person handing out money to strangers, the letters noted above show Mr. Liddy practices in his personal life what he does in public: he gives without being asked.

Third, childhood trauma supports a variance or departure. Mr. Liddy grew up in a dysfunctional family that had severe difficulties coping financially and otherwise with his father's imprisonment. Mr. Liddy became the butt of jokes and bullying from classmates, teachers, and the public. That family was impoverished and had to move onto food stamps and other forms of public assistance.

Fourth, his character as reflected by what others say about him. Mr. Liddy is, without a doubt, a good and generous person. He helps others in his personal life, provides for those who do not have the means to do so, and served his state honorably as a Deputy Attorney General.

Fifth, the nature of this case warrants a departure or variance. Mr. Liddy is far from the usual offender. He was not a collector and had no active images on his computer as of the day of his arrest.

Sixth, Mr. Liddy's post-offense rehabilitation. Post-offense rehabilitation can provide the basis for a downward variance. *Gall v. United States*, 552 U.S. 38, 59 (2007). As in *Gall*, Mr. Liddy's rehabilitation with the VA was "undertaken not at the

20

1   direction of, or under supervision by, any court, but on his own initiative. *This also lends*

2   *strong support to the conclusion that imprisonment was not necessary to deter Gall from*

3
    *engaging in future criminal conduct or to protect the public from his future criminal*
4
    *acts.*" *Id*. (emphasis added).
5

6       In this case, Mr. Liddy understood that his conduct was related to his PTSD

7   symptoms and so after his arrest he went to the VA to seek help *on his own initiative*.  On
8
    January 29, 2018, the VA assigned Mr. Liddy to treatment in Priority Group One and he
9

10  has been religious about his PTSD treatment, which would be unavailable in prison.  He

11  has completed the intensive VA program for combat related PTSD, which requires a
12
    service-connected health interview.  He also has continued to attend the separate court
13

14  ordered treatment program as part of his release conditions, but that program does not

15  address PTSD.  As with *Gall*, the fact that Mr. Liddy receives treatment related to the
16
    reasons for this offense on his own initiative is "*strong support to the conclusion that*
17

18  *imprisonment was not necessary to deter Gall from engaging in future criminal conduct*

19
    *or to protect the public from his future criminal acts.*"
20

21      Seventh, Mr. Liddy's age and health, particularly in this age of coronavirus,
22
    supports a departure and/or variance.  His medical conditions, in addition to his PTSD,
23

24  include Asymptomatic Coronary Artery Disease, Dyslipidemia, Steatotic Hepatitis, and a

25  chronic cough of unclear etiology[8].  Because of his PTSD he takes Xanax (Alprazolam),
26

27

28  _____

[8] The doctors, despite repeated testing, cannot determine why he has a chronic cough that often results in vomiting.

21

1
2
3
4

an immunosuppressant.[9]  Dr. Clipson believes that if Mr. Liddy goes to prison that "[h]e is almost certain to become depressed and suicidal behaviors would be very likely."  *See*, sealed materials.

5
6
7
8
9
10
11
12

The danger posed by Covid-19 has changed the world nearly overnight and would adversely affect Mr. Liddy if incarcerated.  According to Dr. Anthony Fauci[10], "[t]he degree of efficiency, of transmissibility of this virus is really unprecedented. . . It is an extraordinarily efficient virus in transmitting from one person to another."[11] The danger posed by Covid-19 to an imprisoned person who has Mr. Liddy's conditions could cause great harm.

13
14
15
16
17
18
19
20

In the United States alone, the global coronavirus pandemic has killed more than 176,223 people and infected over 5.8 million. *See* Tracking coronavirus' global spread (August 24, 2020 2:08 pm), www.cnn.com/interactive/2020/health/coronavirus-maps-and-cases. The Federal Bureau of Prisons ("BOP") reports that "there are 1,493 federal inmates and 634 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 10,296 inmates and 875 staff have recovered. There have been

21
22
23
24

[9] Chang, Sastle, Dorman, Suppressive effects of alprazolam in the immune response of mice, Int. J. Immunopharmacol, 1991;13(2-3):259-266. doi:10.1016/0192-5061(91)90106-h (available at https://pubmed.ncbi.nlm.nih.gov/2071299/).

25
26
27

[10] Director of the National Institute of Allergy and Infectious Diseases ("NIAID").  The website for the NAIAD says this about Dr. Fauci: "In a 2019 analysis of Google Scholar citations, Dr. Fauci ranked as the 41st most highly cited researcher of all time. According to the Web of Science, he ranked 8th out of more than 2.2 million authors in the field of immunology by total citation count between 1980 and January 2019."  The remainder of his biography is at https://www.niaid.nih.gov/about/anthony-s-fauci-md-bio.

28

[11] https://www.washingtonpost.com/politics/2020/04/17/laura-ingraham-fauci-interview/

116 federal inmate deaths and 1 BOP staff member death attributed to COVID-19 disease." https://www.bop.gov/coronavirus/ (accessed August 24, 2020)..

BOP facilities and staff are facing a tidal wave of infections partially because the BOP must house a lot of prisoners in very tight quarters. Once the virus spreads inside BOP facilities, there is little to stop it, as is happening at Terminal Island. BOP has decided as a policy matter to battle this virus by treating the prisons as fortifications that will nominally deny entry to outside infestation by among other things, ending inmate visitation and requiring the Staff to self-report infections.[12] As the Court knows, the government now frequently recommends a variance of -2 due to the pandemic.

V.     The just sentence is probation

Title 18 U.S.C. § 3553(a)(2) address retribution, deterrence, incapacitation, and rehabilitation.  *See Tapia v. United States*, 564 U.S. 319, 325 (2011). This Court must impose a sentence that is sufficient, but not greater than necessary, to address these factors, "to the extent that they are applicable in light of all the circumstances of the case." *See* 18 U.S.C. §§ 3551(a), 3553(a); *Tapia*, 564 U.S. at 325.  Imprisonment can be useful and necessary to accomplish retribution and incapacitation, but it is certainly not always necessary and appropriate to impose imprisonment.  In this case, there is no mandatory minimum.

Mr. Liddy does not need incarceration in this case, as probation (or supervised

---

[12] https://www.bop.gov/coronavirus/covid19_status.jsp.

23

release) will significantly restriction his liberty, as have the conditions of his release for over three years.  The Supreme Court has recognized that supervision is a serious restriction on a liberty.  *See Gall*, 552 U.S. at 48.  Individuals on supervision are "nonetheless subject to several standard conditions that substantially restrict their liberty." *Id.*; *see also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.") (internal citation and quotations omitted).  Mr. Liddy has now spent over three years on conditional release (with no violations) with the following impacts on his liberty: part of that time he was monitored by GPS equipment; all that time he has had mandatory counseling and home visits; he has had to seek permission for any travel; he has strict limits on where he can be, and; he has been unable to use the internet.  Whatever restraint on liberty he has on probation will simply be an extension of the restraints he has had during the three years since his arrest.

Even more liberty restricting, Mr. Liddy will face a lifetime of registration as a sex offender, restricting where he can live, who he can associate with, and where he can go.  See, California Penal Code § 290.005(d)(3)(R) (felony convictions for possession of child pornography are Tier Three offenses requiring lifetime registration).  As a registered sex offender, Mr. Liddy will have his name and address publicly disclosed for

life.  If he plans on travelling to certain states, he will have to notify authorities.[13]  He will have to notify authorities at least 21 days before any international travel.  18 U.S.C. § 2250(b).  His passport will identify him as a sex offender.  22 U.S.C. § 212b.  Should he move to other states, he may face restrictions on where he can work or live.  Rolfe, *supra*, pages 8-11.  Mr. Liddy will most certainly be disbarred by the California Bar and prohibited from entry onto any military base, a privilege dear to him.  His punishment for this case will continue to his death from registration alone.

Moreover, under 18 U.S.C. § 3563, this Court can fashion a number of conditions to accomplish retribution and incapacitation, and deterrence, which will serve to protect the community and address the issues that contributed to him becoming involved in this offense.  Imprisonment, particularly in this unique case, will not rehabilitate, as Congress has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation."  *See* 18 U.S.C. § 3582(a).  He is not a violent person or a pedophile.

Additionally, incarceration would be especially difficult for Mr. Liddy, given his PTSD, anxiety, and medical conditions.  Finally, there is no doubt that the ordeal of this case has deterred Mr. Liddy from even the thought of criminal conduct.  General deterrence has also been achieved.  Along with the shame and remorse he feels, the hurt and pain he has caused to his family, and the hurt and shame he feels that he might have

---

[13] *See* Rolfe, Shawn. (2017). When a Sex Offender Comes to Visit: A National Assessment of Travel Restrictions. Criminal Justice Policy Review. 10.1177/0887403417742948, page 8 (94% of states require registered sex offenders visiting from another sate to register).

contributed to the harm of others, he lives with knowing that his arrest and guilty verdict has been broadcasted across the country by the Associated Press, among other news sources, citing his relation to his father (no citation needed), and this offense will forever haunt him.

Thus, imprisonment is a punishment that is greater than necessary to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a)(2). As discussed above, a sentence of probation with conditions to include PTSD health treatment will appropriately accomplish the purposes of sentencing.

Conclusion

Mr. Liddy asks the Court to sentence him to probation.

Dated: August 26, 2020

Respectfully submitted,

/s/ Knut Johnson

Knut S. Johnson
John C. Ellis
Devin Burstein
Attorneys for Mr. Liddy